UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　　　Plaintiff,<br><br>v.<br><br>EDGAR DAGOBERTO AGUILERA (1),<br>and MIGUEL ANGEL SAVELLANO (2),<br><br>　　　　　　　　　　Defendants. | Case No.: 17CR0372-JLS<br><br>**ORDER GRANTING DEFENDANTS' MOTIONS TO SUPPRESS EVIDENCE** |

　　　Currently pending before the Court are Defendants' motions to suppress evidence challenging the stop and search of the vehicle they were occupying at the time of their arrest (ECF Nos. 43 and 44). The Government filed a response in opposition to Defendants' motions and an evidentiary hearing was held on July 12, 2017. At the conclusion of the hearing, the Court requested additional briefing. Defendants each filed a supplemental motion, the Government filed a response in opposition, and Defendants each filed replies. Having now fully considered the submissions of the parties as well as

1

the evidence and testimony presented at the hearing, the Court will grant Defendants' motions.

## Facts

On January 19, 2017, Border Patrol Intelligence Agents were conducting undercover surveillance on a suspected stash house for undocumented aliens on G Street in Brawley, California. Brawley is located north of El Centro, California, approximately 30 miles from the U.S./Mexico border. According to the testimony of Border Intelligence Agent Rachel McCaslin, two highways in the Brawley area are commonly used to smuggle aliens towards Los Angeles: Interstate 8 and the S-2. ECF No. 60 at 14.

Agents first began surveilling the G Street residence on January 4, 2017, after they followed the caretaker of a different suspected stash house removing mattresses from that house and delivering them to the G street house. On that day, 15 days prior to the vehicle stop at issue in this case, agents stopped Defendant Savellano with an undocumented alien. Defendant Savellano was released, but told agents that the S-2 highway was being used frequently to bring undocumented aliens north to Los Angeles. *Id*. at 19. Defendant Savellano told agents that the S-2 route had been used the previous week, using a grey vehicle agents previously observed during the investigation, to bring illegal aliens north to Los Angeles and $20,000 cash south. *Id*.

On the evening of January 19, 2017, agents observed a burgundy Ford F-150 pickup truck arrive at the G Street house. *Id*. at 42. By this time, agents had been conducting daily surveillance of the residence for a two-and-a-half-week period and had observed suspected undocumented aliens enter the house, but never saw them exit. *Id*. at 24.

Border Intelligence Agent Widhalm was in an unmarked vehicle nearby and began following the F-150 after it left the residence. *Id*. at 44. Agent Widhalm followed the vehicle, at varying distances, for close to an hour, for approximately 50 miles. *Id*. at 45. At one point, as Agent Widhalm got close to the vehicle to look at the license plate, it appeared to him that "there may have been the silhouette of people sitting in the back

seat."[1]  *Id.* at 45-46.  This was significant to Agent Widhalm because he thought he'd overheard that only two people had showed up at the G Street house in the vehicle, so any additional passengers in the truck would have suggested that they picked somebody up there.  *Id.* at 46.

Agent Widhalm did not recall if he conveyed the information about the silhouettes in the back seat to anyone else.  *Id.* at 47.  Agent Widhalm did not stop the vehicle, or ask for it to be stopped, that decision was made Widhalm's supervisor, Agent Alexander.  *Id.*  There was no radio chatter from the agents following the truck indicating that rear seat passengers were seen inside the truck.  *Id.* at 36.  To the contrary, transcripts of the radio transmissions during the surveillance reflect an observation that only the driver and passenger were visible inside the vehicle.  ECF No. 69 at 26.

Border Patrol Agent Harwin was on duty in a marked vehicle on the evening of January 19, 2017 when he received a call to initiate a stop of the F-150.  ECF No. 60 at 57-58.  Transcripts of the radio transmissions preceding the stop indicate that agents were concerned that the F-150 might be headed to Campo.  ECF No. 69 at 33 ("I don't want to follow this thing all the way to Campo like last time.")

When Agent Harwin initially received the call to stop the vehicle, he was told the truck was travelling westbound on I-8.  ECF No. 60 at 59.  However, when Agent Harwin caught up to it, the truck had turned westbound onto the S-2.  *Id.* at 59-60.  During the time he followed the vehicle, Agent Harwin observed only the silhouettes of two heads, the driver and passenger.  *Id.* at 61.

Border Patrol Agent Barrientos was also in the area in his marked vehicle when he heard a request over the radio to stop a vehicle "possibly loaded with illegal aliens that loaded at the stash house."  *Id*. at 63.  Agent Barrientos encountered the F-150 approximately ten to fifteen seconds after Agent Harwin pulled it over.  *Id.* at 64.  Agent

---

[1] On cross-examination, Agent Widhalm clarified his initial testimony and indicated he was "fairly certain" that he saw the silhouettes.  *Id*. at 51.

3

17CR0372-JLS

Barrientos approached the driver's side of the F-150 and asked the driver, Defendant Aguilera, for his proof of citizenship. *Id.* Agent Barrientos asked Defendant Aguilera to lower the back windows, because they were dark-tinted. *Id.* Agent Barrientos then observed four individuals seated in the back seat of the truck. *Id.* Agent Barrientos was not able to see any of the rear passengers before Defendant Aguilera rolled the rear window down. *Id.* at 67.

The four rear passengers were subsequently determined to lack authorization to be in the United States. During depositions following their arrest, the material witnesses testified that, prior to being pulled over, they were laying down in the rear seat area of the truck, two on the floor, and two on the seat. ECF No. 43, Exs. B-D. Defendant Aguilera and Defendant Savellano, the passenger, were arrested and charged with four counts of illegal transportation of aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii), (v)(II), and (a)(1)(B)(i).

**Analysis**

The Fourth Amendment's prohibition against unreasonable searches and seizures extends to the investigatory stop of a vehicle. *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1121 (9th Cir. 2002), citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). In making a determination of reasonable suspicion, the court must look to the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Although an officer's reliance on a mere "hunch" is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard. *Id.*

Drawing from the relevant factors set forth in *Brignoni-Ponce, supra*, the Government points to several factors which it contends give rise to reasonable suspicion that criminal activity was afoot. First, the investigation took place in Brawley, just north of El Centro in the Imperial Valley and egress from the area involves having to go

through or circumnavigate Border Patrol checkpoints. Second, the surveillance began approximately 30 miles north of the U.S./Mexico border and continued to a more secluded highway, similarly just north of the border. Third, the vehicle was stopped after it had exited the I-8 freeway onto the S-2 Highway, which has a checkpoint that is "infrequently operational" and was known to the agents as the route alien smugglers from Brawley were currently using. Fourth, the vehicle was seen leaving a suspected alien smuggling stash house that had been under surveillance for several weeks. Fifth, the vehicle traveled westbound and northbound on a known smuggling route at a high speed. Sixth, Agent Widhalm believed that he had potentially seen the silhouette of people in the back seat. Seventh, the Ford F-150 truck was capable of carrying additional people. Finally, the Border Patrol Field Intelligence Team that was investigating this case was very experienced and they explicitly called out over the radio that the truck "might be loaded."

    The Court has no doubt that the experienced agents following the F-150 believed that the truck might contain illegal aliens. The question is whether this suspicion was sufficiently particularized to justify the stop of the defendants, or whether it was merely a hunch. This is an extremely close call given the information known by the agents about the stash house and the fact that the F-150 was observed leaving the house and then proceeding westbound on Interstate 8. However, the Court finds the totality of the evidence lacking with respect to individualized suspicion that these particular defendants were engaged in criminal activity. To hold otherwise would support the stop of virtually any vehicle seen leaving the G Street residence, a result that cannot be consistent with the Fourth Amendment.

    The Court agrees that the evidence does establish that Brawley is near the U.S./Mexico border; that egress from the area involves having to pass through or circumvent Border Patrol checkpoints; and that the I-8 and S-2 highways are used by smugglers to transport contraband to Los Angeles. However, these highways are also

5

17CR0372-JLS

among the major arteries in the Imperial Valley[2] and are presumably used for ordinary traffic by most area residents and visitors.

The evidence does also establish that the agents possessed knowledge that the S-2 highway was the preferred route for alien smugglers at that point in time. Thus, the fact that the F-150 took the S-2 after travelling westbound on the I-8 might have been a factor worthy of more consideration in the Court's analysis had the evidence not established that the decision to stop the vehicle was made while the F-150 was still travelling on I-8, before it reached the S-2 turn off. In addition, the evidence demonstrates that the S-2 highway was not a significant factor in the agents' decision to stop the vehicle. According to the radio transmissions, agents stopped the F-150 because they were concerned that the vehicle was headed to Campo, which, according to Google maps, is located near the U.S./Mexico border, south of Interstate 8, and many miles west of the S-2 highway interchange with I-8.

The evidence does establish that the agents had good cause to suspect the G Street residence in Brawley of being a stash house for undocumented immigrants. Agent McCaslin's testimony summarized the investigation and surveillance that had taken place at the residence and established that the agents had good cause to believe that undocumented aliens might be inside the house.[3] However, despite the near constant surveillance of the residence, no people from inside the stash house were observed getting into the F-150. Two people were observed arriving in the F-150 and there is no evidence that any additional people were observed being dropped off or picked up.

---

[2] Evidentiary Hearing Government Exhibits 3 and 5.

[3] During Agent McCaslin's testimony the Government sought to introduce Government Exhibit 1, the Report of Investigation summarizing the investigation written by Agent McCaslin. The Court reserved ruling on the admissibility of the exhibit, and now determines that the report is properly **Admitted**. Portions of the report were also submitted by Defendant Savellano in support of his Motion to Suppress Evidence. ECF No. 43, Exhibit A. However, in evaluating the agents' knowledge about the surveillance operation, the Court relies on Agent McCaslin's direct testimony.

This leads to Agent Widhalm's testimony that he may have seen the silhouette of people sitting in the back seat. This observation is troublesome in two respects. First, the observation is equivocal and is contrary to all of the other evidence about the rear seat area of the F-150. It is undisputed that the windows of the truck were heavily tinted and difficult to see through. Agent Barrientos, who approached the vehicle after it was stopped, could not even see the rear seat occupants, who at that time were sitting up, until he ordered the driver to lower the rear window. While the agents were following the F-150, the radio communications reflected that only the driver and passenger were visible inside the vehicle. Agent Harwin, who stopped the F-150, also reported only being able to observe the driver and passenger. In addition, each of the material witnesses testified at their depositions that they were laying down during the transport to avoid being detected.

The second troubling aspect of Agent Widhalm's silhouette observation is that it does not appear to have been communicated to anyone, particularly not anyone responsible for making the decision to stop the F-150. The Government contends that this does not matter because under the doctrine of horizontal collective knowledge Agent Widhalm's observation can be imputed to the team because they were in communication with one another. However, in *United States v. Ramirez*, 473 F.3d 1026, 1037 (9th Cir. 2007), the case cited by the Government for this proposition, the Court held "when one officer knows facts constituting reasonable suspicion or probable cause…*and he communicates an appropriate order or request*, another officer may conduct a warrantless stop, search, or arrest without violating the Fourth Amendment" (emphasis added). Here, Agent Widhalm did not communicate a request to stop the F-150, nor is there any evidence to suggest that he communicated his possible observation of silhouettes to any other member of the team. Under these circumstances, the Court does not believe the collective knowledge doctrine is applicable. *See United States v. Holmes*, 36 F.Supp.3d 970, 980 (D. Montana 2014) ("Any expansion of the doctrine to the type of situation presented here–where the knowledge was isolated in the mind of one of the

7

17CR0372-JLS

investigating officers at the time of seizure and had zero bearing on the seizure itself—is both wholly unsupported by the law and repugnant to the Fourth Amendment.")

Finally, the remaining factors cited by the Government in support of the stop, the high speed the truck was travelling and the fact that it was a type of vehicle capable of transporting people, are not particularly helpful in providing individualized suspicion specific to the defendants. The Court is unable to recall or locate testimony indicating the speed at which the F-150 was travelling, but Agent McCaslin testified that she had to travel at least 90 miles an hour to catch up to the truck after she left the El Centro Border Patrol Station. ECF No. 60 at 22, 23. However, even assuming that the vehicle was speeding on I-8 after Agent McCaslin caught up to it and acknowledging that the truck had the capacity to carry additional people, the Court is not persuaded that these factors significantly differentiated the F-150 from other vehicles travelling on the Interstate that evening.

The Court is mindful that individual factors that may appear innocent in isolation may constitute suspicious behavior when aggregated together. *United States v. Sokolow*, 490 U.S. 1, 9-10 (1989). However, based on the totality of the circumstances and given due weight to experience of the agents involved in the investigation, the Court cannot conclude that the agents had reasonable suspicion to believe that Defendants Aguilera and Savellano were engaged in illegal activity. Even though the area has a high incidence of smuggling activity and is close to the Mexican border, the only evidence to support the inference that the defendants, in particular, were engaged in alien smuggling was the fact that the F-150 stopped at a suspected stash house and then drove west for many miles on the only Interstate freeway in the area. However, all of the evidence—with the exception of Agent Widhalm's uncommunicated observation—suggested that the truck was occupied by only the driver and passenger who arrived at the stash house. Even when combined with the other factors articulated by the Government, the Court is unable to conclude that these factors give rise to a particularized and objective basis for suspecting wrongdoing.

**Conclusion**

For the reasons set forth above, the Court concludes that the stop the vehicle occupied by the Defendants on the night of their arrest was unlawful because it was not supported by reasonable suspicion. Accordingly, Defendants' Motions to Suppress Evidence are GRANTED.

IT IS SO ORDERED.

Dated: September 7, 2017

*Janis L. Sammartino*
Hon. Janis L. Sammartino
United States District Judge